FEE PAID

FILED
CLERK, U.S. DISTRICT COURT

JUN 29 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

1  JASON H. TOKORO (State Bar No. 252345)
   jtokoro@millerbarondess.com
2  MILLER BARONDESS, LLP
3  1999 Avenue of the Stars, Suite 1000
   Los Angeles, California 90067
4  Telephone:  (310) 552-4400
   Facsimile:   (310) 552-8400
5
6  P. JASON COLLINS (Applying *Pro Hac Vice*)
   jcollins@rctlegal.com
7  JEREMY H. WELLS (Applying *Pro Hac Vice*)
   jwells@rctlegal.com
8  REID COLLINS & TSAI LLP
   1301 S. Capital of Texas Highway,
9  Building C, Suite 300
   Austin, Texas 78746
10 Telephone:  (512) 647-6100
11 Facsimile:   (512) 647-6129
12 Attorneys for Plaintiff/Relator
13 INTEGRA MED ANALYTICS LLC
14
15              **UNITED STATES DISTRICT COURT**
16              **CENTRAL DISTRICT OF CALIFORNIA**
17                        **2:21-CV-05265-JFW-RAOx**
18 UNITED STATES OF AMERICA and     **CASE NO.:**
   THE STATE OF CALIFORNIA, *ex rel.*
19 INTEGRA MED ANALYTICS LLC,       **ORIGINAL COMPLAINT**
20         Plaintiff,                **DEMAND FOR JURY TRIAL**
21
22      v.
                                    **FILED UNDER SEAL PURSUANT**
23 WILLIAM NELSON, an individual;   **TO THE FALSE CLAIMS ACT,**
   VICKI ROLLINS, an individual;    **31 U.S.C. § 3730**
24 TORRANCE CARE CENTER WEST,
   INC.; GLENDORA GRAND, INC.;
25 CENTINELA GRAND, INC.; LONG
   BEACH CARE CENTER, INC.; PACIFIC
26 VILLA, INC.; FLOWER VILLA, INC.;
   CENTURY VILLA, INC.; VILLA DEL
27 RIO GARDENS, INC.; VILLA DEL RIO
   CENTER, INC.; WEST COVINA
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400  FAX:(310) 552-8400

363064.1

1  MEDICAL CENTER, INC.; L.A.
   DOWNTOWN MEDICAL CENTER,
2  INC.

3              Defendants.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

363064.1

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 2

JURISDICTION AND VENUE ..................................................................................... 5

PARTIES ........................................................................................................................ 5

SUBSTANTIVE ALLEGATIONS ............................................................................... 7

    A.    Overview of Medicare Reimbursement for Skilled Nursing Rehab ................................................................................................................ 7

    B.    Defendants engaged in a Systematic Patient Recycling Scheme to Submit False Claims to Medicare and Medicaid. ............................ 8

        1.    Defendants Inappropriately Admit Patients for Three-Day Inpatient Stays. .......................................................................... 9

        2.    Defendants Inappropriately Send Patients to Rollins Nelson SNFs, where Patients Receive Medically Unnecessary Treatment. ................................................................ 11

        3.    Defendants Keep Patients at Rollins Nelson Facilities in Order to Wait at Least 60 Days Until a New Spell of Illness Could Begin. ................................................................... 15

        4.    Defendants Inappropriately Admit Patients from Rollins Nelson SNFs Back to Hospitals to Trigger a New Medicare Spell of Illness. ............................................... 19

        5.    Defendants Capitalize on COVID-19 Rules to Continue Recycling Patients. ...................................................... 25

        6.    Leadership Provides Directives and Kickbacks Driving Patient Recycling Scheme. ....................................... 26

        7.    Defendants' Recycling Scheme Caused Direct Harm to Patients. ............................................................................. 28

        8.    Specific Examples of Patients Recycled at Rollins Nelson SNFs. ...................................................................... 28

        9.    Repeat Spells of Illness at Rollins Nelson SNFs Far Exceed those at Other SNFs Nationwide. ................... 33

    C.    Economic Damages ................................................................................. 35

CAUSES OF ACTION ................................................................................................ 37

PRAYER FOR RELIEF ............................................................................................. 39

JURY TRIAL DEMANDED ...................................................................................... 39

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

363064.1

ORIGINAL COMPLAINT

This is an action brought by Plaintiff/Relator Integra Med Analytics LLC ("**Relator**") on behalf of the United States of America pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*., and the State of California pursuant to the California False Claims Act, Cal. Gov't Code § 12650, *et seq*. In support thereof, Relator alleges as follows:

## INTRODUCTION

1.     Relator brings this action to recover more than $136.5 million billed to Medicare and Medicaid through a network of skilled nursing facilities ("**SNFs**") and hospitals owned and operated by Vicki Rollins and William Nelson ("**Rollins Nelson**", and together with the named SNFs, the "**Defendants**").[1] Relator conducted a multi-faceted investigation of Defendants' business practices—including numerous interviews with people that have worked at Rollins Nelson SNFs and hospitals—which uncovered that Defendants have been purposefully engaging in a systematic scheme to recycle patients between i) SNFs owned by Defendants and ii) hospitals in and around Los Angeles, primarily the two owned by Defendants.[2] Defendants bounced patients between hospitals and their SNFs to fraudulently increase reimbursements under Medicare and Medicaid, not for any justifiable medical reason. Relator's factual investigation uncovered that Rollins and Nelson are intricately involved in the day-to-day operations of their facilities and directed staff to carry out Defendants' patient recycling scheme. Relator's extensive statistical analyses reliably indicate that Defendants have carried out this scheme to great effect.

2.     Defendants' scheme involved four steps, each of which were

---

[1] The named Defendants include 9 SNFs and 2 hospitals owned and operated by Rollins Nelson that submitted the false claims at issue in this action.

[2] Relator's analysis only focuses on patients that had at least one referral to Rollins Nelson SNFs from the two hospitals owned by Rollins Nelson—*i.e.*, Defendants West Covina Medical Center and LA Downtown Medical Center.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

specifically designed to maximize Medicare and Medicaid revenue without regard to the patient's medical needs.

3.    **First**, patients were inappropriately admitted as inpatients at hospitals in order to qualify for Medicare Part A reimbursement for their subsequent SNF stay. This includes falsifying patient diagnoses so that they could quality for inpatient treatment, as well as unnecessarily keeping patients for three days at the hospital, which is the minimum number of inpatient days required to qualify for a subsequent SNF stay that is reimbursed by Medicare Part A. Defendants also recruited patients who were visiting their urgent care facility so that they could instead be admitted as hospital inpatients.

4.    **Second**, Rollins Nelson inappropriately channeled patients from hospitals to their SNFs. This was often done against the guidance of doctors who referred their patients to non-Rollins Nelson SNFs but the patients were redirected to Rollins Nelson SNFs. As a result of this scheme, patients were sent to Rollins Nelson SNFs that were over 50 miles away even though there are many SNFs much closer in proximity. In other instances, Rollins Nelson enlisted the help of doctors to perpetuate the patient recycling scheme, who referred patients between hospitals and Rollins Nelson SNFs. Former employees at Rollins Nelson SNFs also recalled that many admitted patients did not have any physical difficulties and did not need to be at those rehabilitative facilities. Rollins Nelson also kept a large proportion of its patients for the full 100 days covered by Medicare—at a rate nearly 5 times the national average—not based on their patients' medical need but rather so as to maximize revenue from Medicare.

5.    **Third**, after their patients' Medicare Part A coverage ran out at their SNFs, Rollins Nelson misused Medi-Cal coverage to keep patients at their facilities for at least 60 days. This is the minimum number of days that must elapse before Medicare beneficiaries can start a new Medicare-reimbursable spell of illness involving a three-day inpatient stay and subsequent stay at a SNF for up to 100 days.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

6.      **Fourth**, Rollins Nelson SNFs and hospitals coordinated with each other to send patients back to hospitals so that they could restart a new spell of illness. Relator uncovered text threads between SNFs and hospitals where facilities would request patients from each other in order to fill their vacancies. As with the first step, Rollins Nelson hospitals would falsify diagnoses and unjustifiably keep patients for three days in order to qualify for a new stay at a Rollins Nelson SNF.

7.      Relators' findings are based on numerous conversations with people that have worked at Rollins Nelson SNFs and hospitals. They consistently describe a culture that is focused not on patient needs but rather on "abusing the Medicare system." Many of the employees voluntarily left employment by Rollins Nelson because they did not want to be in an environment where they were forced to behave unethically from the top management. Others who complained about this fraudulent activity have been dismissed.

8.      In addition to uncovering the specific nature of Defendants' scheme set out above, Relator's statistical analyses reliably demonstrate that Defendants carried out their scheme to great effect. Rollins Nelson is an extreme outlier and has more repeated spells of illness (from hospital to SNF) than any other chain of skilled nursing facilities in the country. Rollins Nelson patients are **30 times** more likely than non-Rollins Nelson patients to have three or more long spells of illness, **87 times** more likely than non-Rollins Nelson patients to have four or more long spells of illness, and **122 times** more likely than non-Rollins Nelson patients to have five or more long spells of illness.

9.      In short, Relator's analyses demonstrate in numerous ways that Defendants' fraudulent scheme has been systematic and pervasive. According to Relator's analyses, between 2014 and 2020, Defendants submitted or caused to be submitted more than $88.3 million in false claims for Medicare reimbursement and additional false claims for reimbursement from Medi-Cal in an amount to be proven

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

at trial, but estimated at $48.2 million.[3] Based on information and belief, this scheme is continuing to this day.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331. This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because Defendants transacted business in this District.

11.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c). During the relevant time period, a substantial portion of the events complained of that gave rise to Plaintiff's claims occurred in this District in violation of 31 U.S.C. § 3729 and § 3730. Further, 31 U.S.C. § 3732(a) provides for nationwide service of process.

12.    There has been no public disclosure of the allegations or transactions as alleged herein. To the extent that there has been a public disclosure unknown to Relator, Relator is an "original source" under 31 U.S.C. § 3730(e)(4) and Cal. Gov't Code § 12652(d)(3)(B). Relator has independent knowledge of the information on which the allegations are based, which materially adds to any publicly available information related to the allegations in this Complaint. Furthermore, Relator has voluntarily provided the information on which these allegations are based to the United States Government and the State of California before filing this qui tam action based on that information.

## PARTIES

13.    Relator Integra Med Analytics LLC is a Texas limited liability company with its principal place of business in Austin, Texas.

---

[3] Defendants' false claims to Medi-Cal arise from (i) coinsurance payments for skilled nursing care for Medicare Part A patients that were dual enrolled in Medi-Cal and (ii) additional daily reimbursements for stays in the facilities after the patient's skilled care under Medicare Part A ended.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

14.     Relator is an associated company of Integra Research Group LLC, which specializes in using statistical analysis to uncover and prove fraud. Integra Research Group LLC's sister company, Integra REC LLC, has extensive experience using statistical analysis to detect and prove fraud, specifically in mortgage-backed securities and other financial markets. Integra REC LLC has successfully initiated and settled cases under the False Claims Act.

15.     Defendant Vicki Rollins owns, operates, and/or controls the Defendant facilities. Upon information and belief, she is a citizen of the United States of America residing in Los Angeles County, California.

16.     Defendant William Nelson owns, operates, and/or controls the Defendant facilities. Upon information and belief, he is a citizen of the United States of America residing in Los Angeles County, California.

17.     Defendant Torrance Care Center West, Inc. ("**Torrance**") is a California corporation located at 4333 Torrance Boulevard, Torrance, California 90503. Torrance is an SNF with the assigned National Provider Identifier ("**NPI**") number 1710072558.[4]

18.     Defendant Glendora Grand, Inc. ("**Glendora**") is a California corporation located at 805 West Arrow Highway, Glendora, California 91740. Glendora is an SNF with the assigned NPI number 1497077739.

19.     Defendant Centinela Grand, Inc. ("**Centinela**") is a California corporation located at 2225 North Perris Boulevard, Perris, California 92571. Centinela is an SNF with the assigned NPI number 1033431374.

20.     Defendant Long Beach Care Center, Inc. ("**Long Beach**") is a California corporation located at 2615 Grand Avenue, Long Beach, California 90815. Long Beach is an SNF with the assigned NPI number 1043305782.

---

[4] An NPI number is a unique identification number assigned to healthcare providers by the Centers for Medicare and Medicaid Services ("**CMS**").

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

21.     Defendant Pacific Villa, Inc. ("**Pacific**") is a California corporation located at 3501 Cedar Avenue, Long Beach, California 90807. Pacific is an SNF with the assigned NPI number 1447656566.

22.     Defendant Flower Villa, Inc. ("**Flower**") is a California corporation located at 1480 South La Cienega Boulevard, Los Angeles, California 90035. Flower is an SNF with the assigned NPI number 1942537907.

23.     Defendant Century Villa, Inc. ("**Century**") is a California corporation located at 301 Centinela Avenue, Inglewood, California 90302. Century is an SNF with the assigned NPI number 1659612992

24.     Defendant Villa Del Rio Gardens, Inc. ("**Villa Del Rio Gardens**") is a California corporation located at 7002 Gage Avenue, Bell Gardens, California 90201. Villa Del Rio Gardens is an SNF with the assigned NPI number 1447767959.

25.     Defendant Villa Del Rio Center, Inc. ("**Villa Del Rio Center**") is a California corporation located at 7004 East Gage Avenue, Bell Gardens, California 90201. Villa Del Rio Center is an SNF with the assigned NPI number 1366959876.

26.     Defendant West Covina Medical Center, Inc. ("**West Covina**") is a California corporation located at 725 S Orange Ave, West Covina, California 91790. West Covina is a hospital with the assigned NPI number 1891187035.

27.     Defendant L.A. Downtown Medical Center, Inc. ("**LADMC**") is a California corporation located at 1711 W Temple St, Los Angeles, CA 90026. LADMC is a hospital with the assigned NPI number 1780183335.

## SUBSTANTIVE ALLEGATIONS

### A.     Overview of Medicare Reimbursement for Skilled Nursing Rehab.

28.     SNFs are designed to provide skilled care, including nursing and rehabilitation services, following an inpatient hospital stay. To be eligible for Medicare benefits for SNFs, a beneficiary must have an inpatient hospital stay of at least three days. Medicare will cover up to 100 days of SNF care per qualifying

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    illness, and beginning on the 21st day of skilled nursing care, the beneficiary is

2    responsible for a daily copayment of approximately $161.[5] This copayment may be

3    covered by another form of insurance, including Medi-Cal. This cycle of a

4    qualifying inpatient hospital stay and a subsequent SNF stay is covered under

5    Medicare Part A and referred to as a "spell of illness" by CMS.

6        29.    In order to qualify for a new spell of illness, Medicare beneficiaries

7    must wait for a period of at least 60 days without being on Medicare Part A

8    coverage. Thus, after at least 60 days of not receiving Medicare Part A benefits at a

9    SNF or any other facility, beneficiaries can claim reimbursement for a new

10   Medicare Part A SNF spell of illness if they are subsequently admitted to an

11   inpatient hospital for at least three days.

12   **B.    Defendants engaged in a Systematic Patient Recycling Scheme to Submit**
13        **False Claims to Medicare and Medicaid.**

14       30.    Through its multifaceted qualitative and quantitative investigation,

15   including interviews of employees that have worked at multiple Defendants'

16   facilities, Relator uncovered that Defendants purposefully orchestrated a scheme to

17   recycle patients between affiliated hospitals and Rollins Nelson SNFs in order to

18   maximize reimbursement from Medicare and Medicaid. These decisions were made

19   without regard to patient need and were instead driven by a desire for increased

20   revenue.

21       31.    Figure 1 illustrates the patient recycling scheme orchestrated at

22   hospitals and SNFs affiliated with Defendants. In Step 1, patients have an inpatient

23   stay at a hospital for at least three days in order to qualify for admission to a SNF.[6]

24   Often, these initial hospital admissions are not justified for a minimum three-day

25   _____

26   [5] *See, e.g.*, Medpac, *SNF Services Payment System* at 1 (Oct. 2016), *available at*
     *https://bit.ly/2TX5TUw.*

27   [6] This can either be at hospitals owned by Rollins Nelson, *i.e.*, West Covina Center
28   or LADMC, or at other hospitals in the Los Angeles area.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000    LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

inpatient visit. In Step 2, patients are inappropriately admitted to Rollins Nelson SNFs. Sometimes, patients are sent to Rollins Nelson SNFs even though their doctors recommended that they be discharged to a non-Rollins Nelson SNF. At other times, patients are admitted to Rollins Nelson SNFs even if they have no qualifying need for rehabilitative or therapy services. In Step 3 of the scheme, Rollins Nelson patients remain at the SNF, but their stay is no longer reimbursed by Medicare Part A. Instead, these patients' stays are classified as long-term care and reimbursed through other sources such as Medi-Cal. Finally, in Step 4, after at least 60 days have elapsed following their Medicare Part A stay at the SNF, the patients are readmitted as inpatients to a hospital so that a new spell of illness can begin.

**Figure 1. Overview of Patient Recycling Scheme at Rollins Nelson.**
The following figure shows how Defendants' patients are recycled from hospital to SNF and back to hospital once they are eligible for a new spell of illness, i.e., after at least 60 days have elapsed after their SNF stay.



1.  **Defendants Inappropriately Admit Patients for Three-Day Inpatient Stays.**

32.  In order to qualify patients to be admitted into Rollins Nelson SNFs, Rollins Nelson hospitals unnecessarily admitted and kept patients for a minimum of three days.

9

ORIGINAL COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

33.     According to a former Registered Nurse ("**RN**") at West Covina Medical Center, patients would be admitted with principal diagnoses that were completely unrelated to their true condition. For example, patients were often assigned chronic obstructive pulmonary disease ("**COPD**") as a default and given unnecessary breathing treatments. Leadership at West Covina Medical Center made it clear that patients would have to stay at the hospital for at least three days, even if it was not medically necessary. To ensure that patients stayed longer than necessary, West Covina Medical Center made it difficult for nurses to find the doctors responsible for signing the discharge orders. As a result, patients often stayed extra days just waiting for the attending physician's signature. A former patient at LADMC remembers only seeing her doctor once during her entire six day stay even though she felt she was "always chasing after doctors." As a result, she had to stay at the hospital for additional days even though she wanted to be discharged earlier.

34.     LADMC unnecessarily admitted and kept patients for at least three days in order to meet the minimum Medicare requirement for a subsequent SNF stay. A former Licensed Vocational Nurse ("**LVN**") recalls that the hospital would "use the system" by keeping patients for the minimum of three days and providing a "bare minimum" diagnosis so that they could be admitted to a SNF. She recalled that many of her colleagues left the hospital since the it was focused on profit maximizing and not helping patients. According to the LVN, "I got into nursing to heal and help. This is about big pharma and business. That got frustrating really quick when you want to dedicate yourself to the betterment of the patient."

35.     Defendants also unnecessarily admitted patients for Medicare Part A inpatient hospital stays—with a minimum of three days—by recruiting patients visiting their urgent care facility. LADMC has an Urgent Care Center and according to a former nurse at the hospital, Defendants would send personnel to the Urgent Care Center every day looking for patients to admit as inpatients to the hospital. Defendant Vicki Rollins knowingly oversaw this fraudulent admissions process and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

1    directed that admissions from urgent care to the hospital be paused from May 11 to

2    May 14, 2021, during inspections by the Joint Commission.

3         **2.    Defendants Inappropriately Send Patients to Rollins Nelson SNFs,**

4         **where Patients Receive Medically Unnecessary Treatment.**

5         36.    Defendants systematically channel patients to Rollins Nelson SNFs in a

6    way that is against the direction of medical professionals, unwarranted by physical

7    proximity and unjustified by medical need.

8         37.    A former Director at LADMC recalls how doctors would be frustrated

9    because they would select a non-Rollins Nelson SNF for their patient's discharge,

10   but contrary to their directives, Rollins Nelson would discharge patients to Rollins

11   Nelson SNFs instead. To justify this self-dealing, Rollins Nelson leadership would

12   lie to doctors, telling them that the patients' insurance did not cover the facility they

13   original assigned to the patient. At times, the situation got so out of hand that

14   doctors would not be able to locate their own patients because Rollins Nelson had

15   discharged them to an alternative Rollins Nelson SNF. According to a former

16   Director at a Rollins Nelson facility, this self-dealing scheme was directed from the

17   top by co-owners Vicki Rollins and William Nelson who shared CEO and COO

18   functions and were intricately involved in the day-to-day operations: "They would

19   control all functions of the hospital," including training the case management team

20   to discharge patients to SNFs owned by Rollins Nelson.

21        38.    Rollins Nelson hospital and SNF staff coordinated with each other to

22   ensure that patients were only discharged to Rollins Nelson SNFs. As seen in the

23   text thread below, a patient was originally scheduled to be discharged ("dc") to a

24   non-Rollins Nelson SNF (Santa Fe Heights). However, upon learning about this, a

25   staff member at LADMC intervenes and requests that the patient be referred "to

26   RNG [Rollins Nelson Group] first " because they are insured by Medicare.

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Text Message
Thu, Apr 15, 11:05 AM

██████ Case management

Hello. ██████ will dc to Santa Fe heights

LADMC

That's from Indio

Why Santa Fe?

Pls call ██████

Ok

I spoke with ██████, she said to refer to ██████. Should we cancel the DC? We'll standby on placement confirmation

LADMC

What's the insurance?

Pls refer to RNG first.

I know ██████ is Medicare

Medicare

Yes

██████ LADMC

39.     Due to the emphasis of sending patients to Rollins Nelson-owned SNFs, the Rollins Nelson-owned hospitals also inappropriately discharged patients to Rollins Nelson SNFs even though they are located much further away than other (non-Rollins Nelson) SNFs. A former RN at West Covina Medical Center recalls how patients would not be sent "to the best or closest facility but we would have to hold them until they could get into a facility owned by them [Rollins Nelson]." As such, even if patients were ready for discharge to a non-Rollins Nelson SNF, Defendants would make them stay for longer until a bed opened up at a Rollins Nelson SNF. This RN noted that "it was clear the patients were coming and going to the same facilities owned by that company."

40.     Figure 2 illustrates the lengthy distances between West Covina Medical Center and the Rollins Nelson SNFs where patients were discharged to. As seen in the chart where larger lines denote SNFs receiving more patients, large numbers of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

363064.1

12

ORIGINAL COMPLAINT

West Covina Patients were discharged to Rollins Nelson SNFs (red dots) that are much further away from the hospital (orange rectangle) than other nearby non-Rollins Nelson SNFs (blue dots). For example, from 2015 through 2019, West Covina sent more than 180 of their patients (11.9% of their SNF referrals) to Centinela Grand even though it is more than 50 miles away. Most other nearby hospitals send most of their patients to more closely located SNFs.

**Figure 2. Map of SNF Discharges for West Covina Medical Center.**
This figure shows, for West Covina Medical Center, the location of the hospital and that of SNFs to which their patients are discharged. West Covina is the orange rectangle, Rollins Nelson SNFs are the red dots, and other nearby SNFs are the blue dots. The thickness of the line designates the proportion of the patients West Covina sends to that SNF. Only SNFs that received at least 50 patients from an inpatient hospital were shown on the map, and lines were drawn only for SNFs receiving at least 50 patients from West Covina.



41.    According to a nursing staff member at LADMC, Rollins Nelson also enlisted the help of physicians to perpetuate the patient recycling scheme. These physicians would refer patients from other Los Angeles area hospitals, including those owned by Rollins Nelson, to Rollins Nelson SNFs. In instances where a patient's condition did not quality for inpatient admission, these physicians would sign off on a direct admission that bypassed typical admission through the emergency department. Also, according to a former director at LADMC, the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

business development group at Rollins Nelson made arrangements with physicians who sent patients back and forth between hospitals and Rollins Nelson SNFs. Rollins Nelson also paid for membership fees, continuing medical education or other fees that physicians themselves should be paying for.

42.     As part of the patient recycling scheme, Rollins Nelson SNFs also routinely admitted patients who had no need for rehabilitation and therapy services. A former nurse at West Covina Medical Center recalls patients being questionably discharged to Rollins Nelson SNFs to get physical therapy even though they were "walking and strong." According to a former therapist who worked at Glendora Grand, the SNF accepted a lot of psychiatric patients who were "young, big and strong men" who had no physical problems and did not need any therapy. As such, therapy staff would not actually provide therapy services during their therapy sessions; they would just follow patients around. This Occupational Therapist would often ask why such patients were admitted but learned that that the reason was "they have Medicare." She recalls multiple examples of inappropriately admitted patients including one who stabbed his own Physical Therapist, and another who chased an Occupational Therapy Assistant such that she had to run and lock herself in the bathroom.

43.     At another Rollins Nelson SNF, Century Villa, a former LVN also noticed that there were many high functioning patients who did not need to be there: "They were just admitting them to fill the beds." She recalls a patient who was walking around and fully ambulatory, and while she had mental issues, she was intelligent and did not need to be at the SNF. This was reflective of many of the patients at Century Villa who in her recollection were simply there "for the pills and the meals."

44.     To maximize Medicare revenue, Rollins Nelson SNFs also kept their patients for longer than medically necessary. Often, this meant keeping patients for the full 100 days of coverage allowable under Medicare Part A, regardless of patient

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

needs. A former therapist at Glendora Grand recalls there being many Medicare patients who had prolonged three month stays at the facility all the while receiving unnecessary therapy. This aspect of Rollins Nelson's scheme can be seen in Figure 3, where 34.9% of all Rollins Nelson SNF patients stay for the maximum allowable 100 days per spell of illness, which is 4.7 times more than the national average.

**Figure 3. Distribution of Length of SNF Stay.**
This figure shows, for Rollins Nelson SNFs and non-Rollins Nelson SNFs, the distribution of days that patients stay at the SNF. The proportion of Rollins Nelson patients staying for the maximum Medicare-allowable 100 days far surpasses the national average.



MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

3. <u>**Defendants Keep Patients at Rollins Nelson Facilities in Order to Wait at Least 60 Days Until a New Spell of Illness Could Begin.**</u>

45.     To ensure that patients start a new spell of illness at its hospitals and SNFs, Defendants keep patients at their facilities for a minimum 60-day waiting period, after which they can be readmitted to their hospitals. Defendants are able to effectuate this scheme by taking advantage of patients on Medi-Cal and of patients with limited family or personal advocates.

46.     Whereas, at a typical SNF, patients are most commonly discharged home, patients at Rollins Nelson SNFs overwhelmingly remain patients at their

facilities after their Medicare Part A coverage ends. This can be seen in Figure 4 where 68.6% of Rollins Nelson SNF patients remain at the facility at the conclusion of their spell of illness, a rate that is **2.7 times the national average**.

**Figure 4. Distribution of Discharge Status for SNF Patients.**
This figure shows, for Rollins Nelson SNFs and non-Rollins Nelson SNFs, the distribution of discharge status for their patients. Most patients at Rollins Nelson SNFs are classified as "Still a patient," whereas patients at non-Rollins Nelson SNFs are most commonly discharged home.



47.    A key reason why Rollins Nelson is able to keep such are large percentage of its SNF patients in its own facilities after Medicare Part A coverage runs out is that a large percentage of its SNF patients (92.8%) are dual-enrolled with Medi-Cal. According to a nurse who has worked in administration at a Rollins Nelson facility, when patients' Medicare Part A coverage was exhausted after 100 days at a SNF, Rollins Nelson facilities would obtain reimbursement from Medi-Cal for the minimum 60-day waiting period before being eligible for a new Medicare Part A spell of illness. Medi-Cal provides reimbursement for nursing services that offset the cost of a patient's stay at a facility after their Medicare Part A SNF coverage ends.

48.    To keep patients for longer, Rollins Nelson hospitals and SNFs also

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   targeted patients who often did not have the mental capacity or any advocates or

2   family members to speak out on their behalf. According to a former LVN at

3   Glendora Grand, these patients were typically homeless and had substance abuse

4   problems which the facility was not equipped to handle. A former LVN at Century

5   Villa recalls that Defendants "like to have patients that don't have family or

6   advocates." From the perspective of a nursing staff at LADMC, "These people are

7   abusing the patient. They have no family members and are just draining their

8   benefits."

9        49.    Defendants' scheme to keep patients for a minimum of 60 days in

10  between spells of illness to qualify for a new spell of illness is clearly evidenced in

11  Figure 5 and Figure 6. Figure 5 shows how the probability that Rollins Nelson SNF

12  patients are more likely to be re-hospitalized jumps right at 60 days after their

13  previous spell of illness. This strong pattern is not seen for patients at non-Rollins

14  Nelson SNFs. In addition, as seen in Figure 6, Rollins Nelson patients have a

15  hospital admission source of SNF or ICF (intermediate care facility) at a rate 10.7

16  times higher than other SNFs, meaning Rollins Nelson is keeping these patients

17  until their next hospital admission.

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**Figure 5. Probability of Rehospitalization per Days After Spell of Illness.**
This figure shows, for Rollins Nelson SNFs and non-Rollins Nelson SNFs, the probability that a SNF patient will be readmitted to a hospital given the number of days after the prior spell of illness. For Rollins Nelson SNF patients, there is a clear and distinctive jump in admission right after the 60-day minimum waiting period for a new spell of illness has elapsed, whereas there is barely any jump for non-Rollins Nelson SNFs. The shading represents a 95% confidence interval.



**Figure 6. Source of Patients for Hospital Admissions.**
This figure shows, for Rollins Nelson SNF patients and non-Rollins Nelson SNF patients, the distribution of the source of their next hospital admission. Rollins Nelson SNF patients are admitted to hospitals from SNFs or ICFs (Intermediate Care Facilities) at a rate 10.7 times higher than other SNFs.



**4.** **Defendants Inappropriately Admit Patients from Rollins Nelson SNFs Back to Hospitals to Trigger a New Medicare Spell of Illness.**

50.     Relator has uncovered that Defendants deliberately schemed to send their SNF patients back to hospitals for three-day inpatient stays in order to qualify for a new spell of illness. Moreover, Rollins Nelson hospitals readmitted these SNF patients even when it was medically unnecessary—even exaggerating diagnoses to justify admission.

51.     Leadership at Rollins Nelson SNFs was involved in sending patients to hospitals in order to start a new Medicare Part A spell of illness. A former LVN at Torrance Care Center witnessed how the SNF was rotating patients in and out for financial means. This nurse overheard leadership at the SNF mentioning that when patients' insurance would run out, they should be readmitted to the hospital to get checked out so that they could get them back to the SNF.

52.     Together with leadership at Rollins Nelson SNFs, leadership at Rollins Nelson hospitals have regularly coordinated with each other over text messages to inappropriately and unjustifiably readmit Rollins Nelson SNF patients to Rollins Nelson hospitals, thus perpetuating the patient recycling scheme. Relator uncovered text threads between Rollins Nelson hospitals and Rollins Nelson SNFs where Defendants' employees made each other aware of openings at their respective facilities so that they could use their own patients to fill empty beds. In the text below, the staff at West Covina lets other facilities know that there are openings and requests that "Team, please support WCMC today."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400



53.    In another text thread, staff likewise request patients from the other Rollins Nelson facilities with the request: "Team, kindly support."



1

2      54.    Additional text messages further reveal the fraudulent practice of

3  inappropriately readmitting Rollins Nelson SNF patients to Rollins Nelson hospitals.

4  For example, an employee at a Rollins Nelson SNF sent a text message to an

5  employee at a Rollins Nelson Hospital saying that they would like to have a patient

6  admitted for "earache [sic] & can't hear well" and later another patient for

7  "shortness of breath upon exertion," which according to a nurse who has worked at

8  LADMC is a fabricated symptom for an unnecessary admission.

9      55.    In another instance, another patient is referred from Glendora Grand, a

10 Rollins Nelson SNF, to a Rollins Nelson hospital with "cough and congestion,"

11 again which according to a nurse who has worked at LADMC is not sufficient basis

12 for an inpatient hospital admission.

13
14
15
16
17
18
19
20
21
22
23
24
25



26

27      56.    Rollins Nelson SNF and hospital staff knew that certain patients did not

28 qualify for admission as Medicare-reimbursable inpatients. Nevertheless, as seen in

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

the text thread below, they were instructed that "Because of insurance" a patient could "only be admitted as Inpatient iupon [sic] arrival." The only reason that the patient needed to be admitted as an inpatient is so that the patient could start a new spell of illness and thus be recycled back to a Rollins Nelson SNF. If the patient were not admitted as an inpatient, they would not qualify for a subsequent stay at a SNF. As such, the text thread below demonstrates that Rollins Nelson SNF staff were pre-determining the status of patients' prospective hospital stays based on Medicare requirements for starting a new spell of illness, when it should be the admitting clinical staff at the hospital who should determine whether a patient should be admitted under an inpatient or outpatient status.



57.    Rollins Nelson SNFs predetermined the hospital length of stay for patients so that they could qualify for readmission to their SNFs. In another text thread, an employee affiliated with Glendora Grand requests that a doctor keep a patient for "3 days in patient [sic]", which is the minimum number of inpatient days

1  to qualify for Medicare Part A admission to a SNF.

2      58.    Multiple people who have worked at Rollins Nelson hospitals

3  witnessed inappropriate admission from Rollins Nelson SNFs for the purpose of

4  recycling patients. A former staff in admissions recalls a "rotation" scheme where

5  patients from Rollins Nelson SNFs were sent to the hospital when their insurance

6  ran out, all the while not having the ability to decline inappropriate admissions

7  because leadership made them follow orders. This former admissions staff observed

8  clinicians regularly noting that patients did not meet the criteria for admission,

9  saying, "They are just going to sit here and they don't need medical attention." One

10 clinician in particular, Rachel, would always complain about unnecessary

11 admissions. When she complained to leadership she was let go from her position.

12      59.    A former nurse at LADMC similarly witnessed how Rollins Nelson "is

13 abusing the Medicare system" by self-dealing patients from its SNFs to its hospitals,

14 and orchestrating this scheme by manipulating diagnoses to qualify for Medicare

15 Part A admission to a hospital and having patients stay for exactly three days to

16 qualify for Medicare Part A admission to a SNF:

17          "Let's say she owns Glendora Grand, 350 patients. Glendora

18          Grand will fax/send and find the right diagnosis for Medicare.

19          They qualify for a 3 night stay and the fourth day they will send

20          back to the nursing home from which they came."

21

22          "They say the patient has declined ADL even though they are

23          bedbound or in wheelchair."

24

25          "They will delete the medical records and they change the

26          medical record to make it smooth. They upgrade the diagnoses.

27          COPD let's make it with exacerbations. Let's say they have a

28          patient with chronic COPD then they are going to make it with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

exacerbations to worsen the condition."

60.    A former director at LADMC recalls seeing previous patients back at the hospital even though they were unnecessarily admitted and did not need the hospital's services. There would be a mismatch between the diagnoses assigned to patients and their actual needs because diagnoses were assigned based on insurance rather than being based on patients' actual condition.

61.    Another former staff at LADMC, who worked in behavioral health, witnessed how admitting "criterias [sic] are not being followed," and that this is driven by the conflict of interest where Rollins Nelson SNFs and hospitals have the same owners. As such, she reported that many patients were admitted who did not require the level of care of a hospital. Then, patients would be discharged to Rollins Nelson SNFs: "If they came from the facility then they are going back to the facility. If it is a new patient then of course they are going to send them to their facilities."

62.    Rollins Nelson also sends SNF patients to its hospitals even though there are much closer alternatives. This is similar to how patients are sent from Rollins Nelson hospitals to Rollins Nelson SNFs even though they are much further away than other non-Rollins Nelson SNFs. According to a former nurse at LADMC, patients would come to the hospital as far away as from Riverside County (where Centinela Grand SNF is located) which is over 70 miles away. As shown in Figure 7, Rollins Nelson SNFs frequently transfer patients to Rollins Nelson hospitals instead of nearby hospitals that also receive SNF patients. In fact, Centinela Grand (the right-most red circle on the map) sent 30.6% of its SNF transfers to West Covina which is 53 miles away, despite there being many closer alternatives.

**Figure 7. Map of Rollins SNF Transfers to LA Downtown Medical Center and West Covina Medical Center.** This figure shows, for Rollins Nelson SNFs, the hospitals they most frequently transfer patients to. West Covina and LA Downtown Medical Center are the orange rectangles, Rollins Nelson SNFs are red circles, and other hospitals are in blue rectangles. The thickness of the line designates the proportion of the patients the Rollins Nelson SNFs send to that hospital. Only hospitals that received at least 50 patients from a SNF are shown on the map, and lines from Rollins Nelson SNFs are only shown if they sent at least 50 patients to that specific hospital.



### 5.   Defendants Capitalize on COVID-19 Rules to Continue Recycling Patients.

63.    Due to the COVID-19 pandemic, CMS waived the requirements for starting a new spell of illness. Instead of requiring a three-day inpatient stay at a hospital, nursing homes could trigger a new SNF-qualifying spell of illness if the patient was deemed to have a "change in condition." CMS also waived the 60-day break required for residents restart a new SNF stay.[7]

64.    According to a former Rollins Nelson nurse, during the COVID pandemic, billing staff inappropriately recorded a change in condition in patients for non-qualifying events. For example, if a doctor noted a fever and ordered medication, this would be classified as a change in condition. In addition, billing staff would retroactively seek out opportunities to record a change in condition for patients, scanning medical records for minor issues or treatments, such as patients

_____

[7] https://www.cms.gov/files/document/coronavirus-snf-1812f-waiver.pdf.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  simply receiving antibiotics.

2  **6.** **Leadership Provides Directives and Kickbacks Driving Patient**

3  **Recycling Scheme.**

4  65.    The patient recycling scheme involving Rollins Nelson SNFs has been

5  purposefully orchestrated by Vicki Rollins and William Nelson, the co-owners and

6  executive operators of Rollins Nelson SNFs and hospitals. Rollins and Nelson are

7  intricately involved in the day-to-day operations of their entities. At their hospitals,

8  they have been involved in daily check-ins with staff. At their SNFs, they check in

9  on a weekly basis.

10  66.    At LADMC, Rollins and Nelson were viewed as sharing the CEO and

11  COO functions. A former director there recalls, "On a daily basis, the two owners

12  would control all functions. They single handedly ran the place." To exercise

13  control, Rollins and Nelson would hold meetings every morning to discuss patients'

14  insurance and discharge status. According to the former director, the owners would

15  regularly overrule physicians' discharge orders and instead keep patients for longer

16  in order to meet minimum length-of-stay requirements to qualify for a subsequent

17  Medicare-covered SNF stay.

18  67.    The owners' direct influence on the patient recycling scheme also

19  includes directives for staff to inappropriately admit patients. A former manager in

20  the behavioral health unit at LA Downtown Medical Center recalls being pressured

21  by Vicki Rollins to admit patients who were not qualified to be admitted:

22  "Vicki Rollins would say you are going to take this patient.

23  How am I going to refuse? I am not used to the owner having

24  her hands on every department and calling the shots at every

25  department. You have to do what the owner dictates."

26

27  "Vicki Rollins is driving the bus and if there is an accident we

28  are all responsible. If she was there to monitor or oversee that's

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

ok but she was driving the bus. She is the driver of every department and we are just riding the bus. If there is an accident we will all be dead."

68.    In particular, Defendant Vicki Rollins has been heavily involved in ensuring adherence to the patient recycling scheme. According to a nurse who has worked at LA Downtown Medical Center, Rollins has engaged in the following:

- Overriding hospital staff who wanted to deny the admission of patients coming from Rollins Nelson SNFs because they did not have a qualifying admitting diagnosis. Rollins would tell hospital staff to admit patients independent of their condition.

- Managing a team of marketers who recruited outside patients to be admitted to LADMC and subsequently discharged to Rollins Nelson SNFs in a "vicious cycle of over usage of unnecessary Medicare"; Rollins supported these marketers when hospital staff complained that these patients did not meet the criteria for admission.

- Unnecessarily placing patients in the ICU in order to generate more revenue; this includes billing Medicare for procedures such as intubation even though patients were not intubated.

- Participating in group texts between Rollins Nelson hospitals and SNFs where the facilities would request patients if they had empty beds to fill; staff were afraid to push back on the requests because they knew that Vicki Nelson was part of the group text.

- Placing staff on suspension if they complained about any observed malpractice.

69.    In addition to the kickbacks through self-dealing patients between its hospital and SNF facilities, Defendants also engaged in other wrongful payment schemes. As previously mentioned, Rollins Nelson paid physicians fees for items physicians themselves should be paying for. Furthermore, according to a former

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   director at LA Downtown Medical Center, the owners also bragged about paying off

2   inspectors, and heard one of them saying, "They can sue me. I have money and I

3   don't care."

4       **7.**    **Defendants' Recycling Scheme Caused Direct Harm to Patients.**

5       70.    Rollins Nelson's recycling scheme also harms patients. A nurse who

6   has worked at LADMC witnessed how Rollins Nelson is "abusing" patients for the

7   sake of "draining their benefits," particularly those who have no family members. In

8   one egregious example, she overheard staff saying how they gave a patient a

9   cocktail of drugs at the nursing home so that the patient would not be mentally alert

10  during admission to the hospital, and thus qualify for admission with a diagnosis of

11  altered mental status. A nursing staff at Rollins Nelson's other hospital, West

12  Covina Medical Center, similarly witnessed the same tactic, where patients were

13  over-drugged with psychotropic medications so that they could be diagnosed with

14  altered mental status and thus eligible for inpatient admission. This is consistent

15  with the observation of a former LVN at Torrance Care Center who saw that altered

16  mental status was the most common diagnosis for getting patients admitted.

17      71.    Some patients also got infections by having unnecessarily prolonged

18  stays at Rollins Nelson hospitals. A nurse who has worked at LA Downtown

19  Medical Center recalls how many patients were improperly diagnosed with acute

20  COPD with exacerbation even though their oxygen was normal and no breathing

21  treatment was given. Then, while waiting at the hospital for at least three days in

22  order to qualify for SNF admission, vulnerable patients caught infections while in

23  the hospital when they should have been discharged much earlier.

24      **8.**    **Specific Examples of Patients Recycled at Rollins Nelson SNFs.**

25      72.    The following are examples of specific patients with respect to whom

26  false claims were submitted to Medicare and Medi-Cal pursuant to Defendants'

27  recycling scheme.

28      73.    █████████████████████████████████

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

363064.1

ORIGINAL COMPLAINT



MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

---

[8] In determining Medicare eligibility for SNF coverage, the preceding inpatient hospitalization must be at least three days, excluding the discharge date. As such, inpatient length of stay as calculated here also excludes the discharge date.

[9] Ultra high rehab involves the provision of over 720 minutes per week of a combination of physical therapy, occupational therapy, and speech pathology; very high rehab is attained with 500-720 minutes per week.



MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  [10]
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26 _____
27 [10] At the time, LADMC was called Silver Lake Medical Center—Downtown and
28 was not yet owned by Rollins and Nelson.

ORIGINAL COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14        75.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

363064.1

ORIGINAL COMPLAINT





9.     **Repeat Spells of Illness at Rollins Nelson SNFs Far Exceed those at Other SNFs Nationwide.**

76.     The extent of Defendants' patient recycling scheme has been so egregious that Rollins Nelson is an unprecedented outlier with respect to the average number of long spells of illness—*i.e.*, spells at least 60 days long—per patient. As seen in Figure 8, the vast majority of SNF systems have patients that on average

have less than 1 long spell of illness. This means that most SNF systems keep their patients for less than 60 days and very rarely have patients who return, i.e., who have multiple spells of illness at the same SNF. In contrast, Rollins Nelson SNF patients on average have 4.9 spells of illness 60 days or longer, which is the highest of any SNF system nationwide.

**Figure 8. Average Number of Spells of Illness 60+ Days for SNF Systems.**
The following figure shows the distribution of systems based on the average SNF spells of illness its patients have. The average patient at most SNF systems only less than one spell of illness that is 60 days or longer, while Rollins Nelson's patients have 4.9 spells of illness 60 days or longer on average, as marked by the red-dashed line.



77.    Figure 9 further illustrates how Defendants' patient recycling scheme results in abnormally high rates of long spells of illness at Rollins Nelson facilities. Whereas only 4% of patients at other SNFs have two or more long spells of illness at those SNFs, 40.2% of Rollins Nelson patients have two or more long spells of illness, **or over ten times more**. Similarly, Rollins Nelson patients are **30 times** more likely than non-Rollins Nelsons patients to have three or more long spells of illness, **87 times** more likely than non-Rollins Nelson patients to have four or more long spells of illness, and **122 times** more likely than non-Rollins Nelson patients to have five or more long spells of illness.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1
2

**Figure 9. Distribution of Patients by Spells of Illness at least 60 Days**
This figure shows the percent of patients with a given number of spells of illness at least 60 days. The red columns are for patients at Rollins Nelson facilities and the blue columns are for patients at non-Rollins Nelson facilities.

3
4
5
6
7
8
9
10



11
12
13

14    **C.    Economic Damages.**

15        78.    Relator employs a robust and conservative methodology to quantify the

16    economic damages caused by Rollins Nelson facilities' fraudulent patient recycling

17    scheme. To start with, for calculating damages for each phase of the scheme, only

18    patients with two or more spells of illness at Rollins Nelson SNFs lasting 60 days or

19    longer were considered part of the scheme for calculating economic damages.

20    Further, at least once during the claims period, patients had to have been referred to

21    Rollins Nelson SNFs by the Rollins Nelson-owned hospitals, been classified as

22    "Still a Patient" at the end of the SNF claim, and get re-admitted to a hospital

23    between 60 and 365 days of the end of the SNF claim with a hospital admission

24    source of "SNF/ICF Transfer." In other words, although other patients were likely

25    affected, the economic damages are limited to some of the most severe instances of

26    patient recycling.

27        79.    In the first phase of the scheme, the unnecessary inpatient hospital

28    admission, Relator conservatively limits the damage calculation to only include

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

revenue earned by the Rollins Nelson hospitals from inpatient stays with a length of three to seven days. Further, patients had to have come from a Rollins Nelson SNF, where their discharge status was "Still a Patient," within the last 365 days, with a hospital admission source of "SNF/ICF Transfer." Relator quantified the Medicare Part A revenue received during the inpatient stays that were part of the scheme and found that Rollins Nelson Hospitals have received at least $9.5 million.

80.    In the second phase of the patient recycling scheme, the unnecessary admission to a Rollins Nelson SNF, Relator quantified the revenue Rollins Nelson received for each spell of illness that was 60 days or longer. On the claims for patients that were subject to the scheme, Rollins Nelson SNFs have received at least $78.8 million in Medicare Part A reimbursements. Additionally, after staying 20 days, patients are required to make a copayment, which can be covered by Medi-Cal. Rollins Nelson SNFs have received at least $21.2 million in reimbursements from Medi-Cal for copayments after the 20th day of stay for its patients who are dual-enrolled in Medicare and Medi-Cal.[11]

81.    In the third phase of the scheme, Rollins Nelson unnecessarily kept patients at its facilities after the patient's Medicare Part A SNF stay. Medi-Cal pays a daily rate to nursing facilities for the treatment of patients. To be conservative, Relator only included patients whose discharge status after the SNF stay was classified as "Still a Patient," and were admitted to a hospital within 365 days of their SNF discharge with the admission source of "SNF/ICF transfer." Relator calculates that Rollins Nelson SNFs have received at least $27.1 million from Medi-Cal for keeping patients at the facility between Medicare Part A SNF and Hospital claims.

82.    In summary, Defendants schemed to maximize revenue across SNF and

---

[11] Approximately 95% of long spells of illness involving patients subject to the patient recycling scheme are for patients dual-enrolled on Medi-Cal.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  hospital settings, receiving funds from both Medicare and Medi-Cal. In total,

2  Relator has conservatively determined that the Defendants' fraudulent scheme has

3  led to at least $88.3 million in excess billings to Medicare and approximately $48.2

4  million in excess billings to Medi-Cal. Based on its investigation, Relator believes

5  that the patient recycling scheme continues to be active at the time of filing, and thus

6  the economic damages will very likely be larger than the values reported.

## CAUSES OF ACTION

### COUNT ONE

### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)

### (Against All Defendants)

11  83.  Relator repeats and realleges every allegation contained above as if

12  fully set forth herein.

13  84.  As described above, Defendants have submitted and/or caused their

14  facilities to submit false or fraudulent claims to Medicare and Medicaid by recycling

15  patients between its hospitals and its SNFs solely to maximize revenue and without

16  regard for medical necessity. The conduct described herein also violated, among

17  other things, the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark

18  Law, 42 U.S.C. § 1395nn.

19  85.  By virtue of the scheme described above, Defendants have violated:

20  (a)  31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing

21       to be presented, false or fraudulent claims for payment or

22       approval; and/or

23  (b)  31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or

24       causing to be made or used, a false record or statement material

25       to a false or fraudulent claim; and/or

26  (c)  31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or

27       causing to be made or used, a false record or statement material

28       to an obligation to pay or transit money or property to the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.

86.    In conducting their patient recycling scheme, Defendants also conspired with each other to defraud the federal government in violation of 31 U.S.C. § 3729(a)(1)(C), by knowingly and systematically falsifying claims allowed or paid by the government.

87.    The United States has suffered and continues to suffer damages as a direct proximate result of Defendants' false or fraudulent claims.

## COUNT TWO

### Violation of the California False Claims Act, Cal. Gov't Code § 12651(a)
### (Against All Defendants)

88.    Relator repeats and realleges every allegation contained above as if fully set forth herein.

89.    As described above, Defendants have submitted and/or caused their facilities to submit false or fraudulent claims to Medi-Cal by recycling patients between its hospitals and its SNFs solely to maximize revenue and without regard for medical necessity.

90.    Defendants, by the conduct set forth herein, have violated:

(a)    Cal. Gov't Code § 12651(a)(1) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(b)    Cal. Gov't Code § 12651(a)(2) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(c)    Cal. Gov't Code § 12651(a)(7) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the

government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.

91.  In conducting their patient recycling scheme, Defendants also conspired with each other to defraud the State of California in violation of Cal. Gov't Code § 12651(a)(2), by knowingly and systematically falsifying claims allowed or paid by the government.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for relief and judgment, as follows:

(a)  Defendants pay an amount equal to three times the amount of damages the United States has suffered because of Defendants' actions, plus a civil penalty against Defendants of not less than $11,803 and not more than $23,607 for each violation of 31 U.S.C. § 3729 and Cal. Gov't Code § 12651(a);

(b)  Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and Cal. Gov't Code § 12652(g);

(c)  Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and Cal. Gov't Code § 12652(g); and

(d)  Relator and the United States be granted all such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Relator hereby demands a trial by jury.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  DATED: June 29, 2021                Respectfully Submitted,

2

3

4                                      By: _____

5                                      Jason H. Tokoro
                                       MILLER BARONDESS, LLP
6

7                                      P. Jason Collins
                                       Jeremy H. Wells
8                                      REID COLLINS & TSAI LLP

9                                      Attorneys for Plaintiff/Relator
                                       INTEGRA MED ANALYTICS LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

363064.1

40

ORIGINAL COMPLAINT